COHEN, Appellant, v. MISSOURI, KANSAS & TEX-AS RAILWAY COMPANY, Respondent.

St. Louis Court of Appeals, May 28, 1907.

1. COMMON CARRIERS: Connecting Carriers: Agency. While a carrier of freight discharges his obligation to a shipper when he places the car containing the freight of the shipper at the usual or convenient place for unloading at the point of destination, and notifies the shipper, yet if, after the shipment, it contracts to carry goods beyond the terminus of its own line, it assumes all the obligations of a carrier to the final point of delivery; the connecting carrier employed in completing the transportation is the agent of the initial carrier and the initial carrier is liable for the defaults of the connecting carrier.

2. ——: ——: ——: Reconsignment. Certain carloads of freight were shipped to St. Louis and placed upon the side tracks of the carrier and the shipper notified of their arrival; a "reconsignment" contract was then entered between the shipper and the carrier whereby on the payment of two dollars per car the cars were to be carried to plaintiff's private switch in a distant part of the city, through connecting carriers. Held. under the reconsignment contract the original carrier was liable for delay in delivery as a common carrier.

3. ——: ——: ——: ——. Where carloads of freight were shipped to St. Louis and before their arrival a reconsignment order was given whereby the cars without extra charge

Cohen v. M., K. & T. Ry. Co.

were to be sent to the shipper's private switch over the lines of connecting carriers, the original carrier was liable for damage by delay in shipping and delivery, over the lines of such connecting carriers.

Appeal from St. Louis City Circuit Court.—*Hon. Danl. G. Taylor,* Judge.

REVERSED AND REMANDED (*with directions*).

*Joseph Wheless* for appellant.

(1) "Reconsignment orders" made new contract for through shipment. After the original contract of carriage ended by arrival in St. Louis, defendant accepted orders to ship cars to another point; these orders and acceptance constituted new contracts of carriage beyond its own line, and bound defendant to deliver accordingly within reasonable time. R. S. 1899, sec. 1082; Klass Com. Co. v. Wabash Railway, 80 Mo. App. 164; Myres v. Diamond Joe Line, 58 Mo. App. 201; Guinn v. Railroad, 20 Mo. App. 453; Pruitt v. Railroad, 62 Mo. 539; Eckles v. Railroad, 72 Mo. App. 305, 112 Mo. App. 250; Shewalter v. Railroad, 84 Mo. App. 597; Davis v. Jacksonville So. Line, 126 Mo. 69; Bennitt v. Railroad, 46 Mo. App. 670. (2) No sufficient excuse for non-delivery. Defendant made these new contracts with full knowledge of all the conditions which it now urges to excuse its failure to fulfill those contracts. It did not notify plaintiff of any unusual conditions likely to cause delay; but accepted the shipments as a matter of course, and collected the charges. This binds the defendant absolutely to make prompt delivery. Russell Grain Co. v. Railroad, 89 S. W. 908; Schwab v. Union Line, 13 Mo. App. 159; Tucker v. Railroad, 50 Mo. 385; Faulkner v. Railroad, 51 Mo. 311; Dawson v. Railroad, 79 Mo. 296; Read v. Railroad, 60 Mo. 199; Lesinsky v. Dispatch Co., 13 Mo. App. 576; 10 Mo. App. 139-40; Gregory v. Railroad, 46 Mo. App.

580; Clothing Co. v. Dispatch Trans. Co., 106 Mo. App. 487.

NORTONI, J.—The plaintiff, a dealer, was the owner and consignee of five cars of scrap iron, shipped to him from some point in Texas over the defendant, M. K. & T. road. The original contract under which the various cars were shipped, it is said, denominated the point of destination to be the city of St. Louis. No particular point in the city was mentioned. Two of these cars arrived at defendant's terminals in north St. Louis on September third, one on September twenty-second, and two on October seventh. The defendant promptly notified plaintiff of the arrival of each car. Upon the arrival of the first three cars, pursuant to the usual custom, defendant placed them upon its "hold" track and while so upon the hold track after their arrival, and prior to the arrival of the last two cars, plaintiff called upon defendant's agent and paid the freight on all five of the cars, giving written directions or "reconsignment orders" to defendant's agent to deliver the five cars at his place of business, a private switch at Twenty-Third and Gratiot streets, which orders defendant accepted and agreed to deliver or cause to be delivered the five cars as directed. At the time of paying the freight and giving such reconsignment orders, plaintiff paid to the defendant an additional charge of $2.00 for each of the three cars then standing on its hold track to compensate it for service in transporting or causing to be transported the three cars mentioned from its hold track to plaintiff's switch at Twenty-Third and Gratiot streets. The charge is denominated in the evidence by the plaintiff and the defendant's agent, a "reconsignment charge." No additional compensation or reconsignment charge was paid by plaintiff on account of the two cars which had not yet arrived for the reason, as given by both plaintiff and defendant, no such charge is made by the railroad companies when they receive

specific directions, or what they term "reconsignment directions" prior to the arrival of the car. In such case, defendant's agent said there is no extra service entailed, inasmuch as it is usually quite as convenient for the railroad company to switch the car to the point of reconsignment in the city onto some private switch as it is to switch it upon its "hold" track, and therefore a $2.00 reconsignment charge is made on account of those cars only which have reached the railroad terminals and passed upon its "hold" track prior to receiving reconsignment directions; that is, directions for delivery to some special point in the city. As stated before, however, the defendant, without requiring more on account of the two cars still en route than the payment of the freight charges from the point of shipment in Texas to the city of St. Louis, accepted the reconsignment directions with respect to those two cars as well and agreed to transport or cause the same to be transported to plaintiff's switch at Twenty-Third and Gratiot streets, as though they were through shipments thereto. No special time was mentioned between the parties when the car should reach plaintiff's switch. It was shown in evidence, however, that such had been and was the usual course of dealing between the parties with respect to numerous prior shipments of like kind and that in the usual course of business, the cars reached plaintiff's switch in from twenty-four to forty-eight hours after their arrival in St. Louis under reconsignment orders; that forty-eight hours was reasonable and ample time therefor. The defendant's terminals or yards are in north St. Louis, adjacent to the river front, and in order to convey the cars to plaintiff's private switch, which is connected with the tracks of the Missouri Pacific Railroad and situated as stated, at Twenty-Third and Gratiot streets, some four or five miles distant from defendant's terminals, it was necessary to pass over the lines of one of three intermediate carriers; the St. Louis

Merchants Bridge Terminal Railroad Company, Wiggins Ferry Company or the Wabash, Western Division, and from thence over the Missouri Pacific tracks to plaintiff's switch. Instead of the several cars reaching plaintiff's switch within the course of forty-eight hours after their arrival and the reconsignment contract, although plaintiff was constantly urging the defendant to deliver the same, they were not delivered for several weeks thereafter, two on October twenty-second, and three on October twenty-third. In the meantime, the price of iron declined, in consequence of which it stands admitted upon the record that plaintiff sustained loss on the sale of the contents of the five cars mentioned, to the amount of $319.35.

The defendant introduced evidence tending to show that on account of the congestion of business on the Missouri Pacific tracks, resulting, probably remotely, from the Mississippi river overflow in June of that year, that road had declared several embargoes against the reception of dead freight, such as plaintiff's iron, from other lines in the city. A portion of this time, however, it had an open order to receive ten cars per day from the defendant. It was shown that defendant made an attempt to deliver one of plaintiff's cars to it in due time and this was rejected, whereupon no further attempt was made in that behalf for some time, until the embargo was removed.

The facts above stated are practically conceded. The real controversy between the parties pertains rather to the conclusion of law on the facts than with reference to the facts themselves. It is insisted upon the part of the plaintiff that defendant is liable to him as a common carrier for the breach of its positive duty as an insurer to deliver the iron within a reasonable time, while on the other hand, it is insisted by the defendant that its duty as a common carrier had ceased and that it was only responsible as a forwarder for the exercise of ordi-

nary care and reasonable diligence in attempting to transport the cars from its terminals to plaintiff's private switch, and that it exercised such care and diligence in attempting to deliver the same to the connecting carrier.

The court adopted the defendant's theory of the case and charged the jury in substance that defendant was acting only as a forwarder after the several cars reached defendant's terminals in St. Louis and was not liable in this action if it exercised ordinary diligence to deliver to its connecting carriers and the delay was occasioned by reason of such connecting carrier's refusal to receive them. The jury found the issues for the defendant under these instructions and plaintiff appeals. A majority of the members of this court are of the opinion the learned trial judge erred in the conclusion that defendant was a forwarder and responsible as such for the exercise of ordinary care only in attempting to deliver to its connecting carriers. Now, it will be necessary to examine the case with reference, first, to the three cars which had arrived and were standing on the hold track at the time of reconsignment, and second, with respect to the two cars then en route. It is true defendant was not required under the original contract of shipment, to convey them beyond its own lines to his private switch, and its full obligation in that behalf was no doubt discharged in view of the established custom shown in the evidence with respect to shipments of scrap-iron in carload lots, by placing the cars in the care of its servants in a reasonably safe place on the usual or convenient side track for unloading and notifying the plaintiff of their arrival. Upon so doing, defendant's relation to those cars as common carrier ceased and that of warehouseman began. [Hutchinson on Carriers (3 Ed.), secs. 711-710; Pindell v. Railway, 34 Mo. App. 675; s. c., 41 Mo. App. 84; Klass Com. Co. v. R. R. Co., 80 Mo. App. 164; Russell Grain Co. v. Wa-

bash R. R. Co., 114 Mo. App. 488, 89 S. W. 908; Loeb v. R. R. Co., — Mo. App. —, 85 S. W. 118.] In this State, the rule is well established, however, that while a common carrier cannot be compelled to do so, it may contract to carry goods to a point beyond the terminus of its own lines and thus assume all of the obligations of the whole route so as to become liable for the delivery at such point, and the liability thus attached at the commencement will continue throughout the entire transit. Where it so undertakes to transport the goods throughout to destination, all connecting carriers employed in furthering and completing such transportation become agents of the initial or contracting carrier, for whose defaults the initial or contracting carrier is responsible to the owner of the goods. [Davis v. Railroad, 126 Mo. 69, 28 S. W. 965; Eckles v. Railroad, 112 Mo. App. 240, 87 S. W. 99; Eckles v. Railroad, 72 Mo. App. 296; Lesinsky v. Great Western Dispatch, 10 Mo. App. 134; Davis Clothing Co. v. Merchants Dispatch, 106 Mo. App. 487, 81 S. W. 226; Hendrix v. Railroad, 107 Mo. App. 127, 80 S. W. 970; Hutchinson on Carriers (3 Ed.), secs. 226 to 230.] This being true, it becomes important to examine the contract by which the defendant undertook to transport the several cars mentioned in order to ascertain whether the relation of common carrier existed and continued at and during the time of the delay which resulted in plaintiff's loss. It appears that while the three cars were being held by defendant as warehouseman on its hold track, it entered into a new contract with him for the reconsignment thereof and the rights of the parties must be determined under the reconsignment contract. It is argued by counsel for defendant that even though this contract is denominated a reconsignment contract, it is not such and that the payment of two dollars per car thereunder was in fact nothing more than a switching charge for services to be rendered by defendant on its own rails to the end of delivering the cars

to its connection. If this be true, then of course it would not amount to a contract of affreightment beyond the terminus of its own tracks. By reference to the record, however, this proposition is entirely overthrown by the proof. We find that plaintiff gave positive evidence to the effect that under the reconsignment of the cars, they were to be delivered to him free of further charge not only over defendant's rails, but those of the intermediate carriers, the Merchants Bridge Terminal and the Missouri Pacific as well, and on this question, the defendant's agent who negotiated the contract on its part, said, in speaking of defendant's obligation thereunder: "The M. K. & T. undertakes to deliver to the new destination through its immediate connections." The agent of the Missouri Pacific Company in speaking of the reconsignment arrangement between the several roads and the compensation received by his road under this contract for transporting the cars over its tracks to plaintiff's switch, said: "The Missouri Pacific makes a switching charge from the connection there to his (plaintiff's) yard; *the connecting line delivering the car paid it—the M., K. & T. in this case.*" And from this, we ascertain by the uncontroverted proof, the defendant not only undertook to pass the cars to the end of its tracks but it undertook as well to transmit them over the tracks of the connecting intermediate line, the Merchants Bridge Terminal and over the Missouri Pacific Company's lines to Twenty-Third and Gratiot streets, for which it received two dollars per car, and it seems, assumed to pay to the Missouri Pacific at least its portion of the compensation thus received. In fact, counsel on the trial admitted the reconsignment arrangement to transport the cars to the plaintiff's switch on Twenty-Third and Gratiot streets. Now this evidence and admission, instead of showing the defendant to be a mere forwarder of the three cars mentioned, to the terminus of its rails or to its immediate connection,

shows a through contract of affreightment from defendant's hold track, whereby, in the language of its agent, "the M. K. & T. undertakes to deliver to the new destination, through its immediate connections." Now, under such circumstances, it is established law that so long as the carrier holds the goods for delivery to succeeding carriers, he holds them for transportation and not for delivery, and therefore holds them as a carrier and not as an ordinary bailee or mere forwarder, and although the connecting carrier refuses or unreasonably delays to receive them the relation of common carrier continues until the carrier, by warehousing the goods, or some other unequivocal act, indicates its purpose to change its relation from that of carrier for transportation to that of a mere custodian for safe keeping or forwarding. It is said that so long "as he holds the goods on his vehicle of transportation awaiting the pleasure, convenience or the necessities of the succeeding carrier, he clearly holds them as a carrier and subject to the liabilities which attach to him in that character." [Bennitt v. Railroad, 46 Mo. App. 656, 670, 671; Hutchinson on Carriers (3 Ed.), sec. 131.] We entertain no doubt whatever that under the reconsignment contract, defendant, continuing to hold the iron on its cars, its vehicles of transportation, as it did, awaiting the convenience of its connecting carriers, continued to sustain the relation of common carrier to the plaintiff and is responsible to him for whatever loss was proximately entailed by the breach of its obligation as such. Now as to the two cars which were still en route at the time the reconsignment directions were given and accepted with respect to them, the evidence discloses that the same contract was entered into by the parties except there was no additional compensation paid to the defendant for the reason none was required. It seems the original contract of affreightment was so modified by the parties that defendant undertook for the same consideration re-

ceived by it in the first instance, that is, the payment of the freight, which was then made from the Texas point to St. Louis, to transport the cars to plaintiff's switch at Twenty-Third and Gratiot streets. On this and other like cases, defendant's agent testified to its undertaking in that behalf as follows: "If the reconsignment order is given before the arrival of the cars at our terminals, no extra charge of two dollars is made. When the reconsignment order is received before the car arrives, prior to any extra services in our yards, we do not make that charge. *The car takes its course the same as other through billed stuff;* that is, not switched to the hold track. It is not necessary to put it there. *The M., K. & T. undertakes to deliver to the new destination through its immediate connections.*" The plaintiff's evidence was equally as positive to the effect that the defendant undertook to deliver the five cars upon his private switch. From this it appears certain the contract of affreightment, as modified, provided for a through shipment, terminating at plaintiff's private switch at Twenty-Third and Gratiot streets, to which the same rule above indicated applies.

There being no controversy in the case with respect to any question of fact and the amount of plaintiff's loss resulting from defendant's default, being admitted, the judgment will be reversed and the cause remanded with directions to the trial court to enter judgment for the plaintiff in the sum of $319.35, with interest at the rate of six per cent per annum from the date of judgment in the court below. It is so ordered. *Goode, J.,* concurs; *Bland, P. J.,* dissents.